**AFFIRMED; Opinion Filed December 21, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00547-CR

**JHOVANNY ESPINOZA, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 296th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 296-80265-2017**

## MEMORANDUM OPINION

Before Justices Myers, Evans, and Brown
Opinion by Justice Myers

A jury convicted appellant Jhovanny Jesse Espinoza of assault family violence (with a prior conviction for assault family violence) and assessed punishment at five years' imprisonment. In three issues, appellant argues the trial court erred in allowing the State to introduce evidence under article 38.371 and article 38.49, and that the evidence is insufficient to support a finding of guilt by a rational trier of fact. We affirm.

### BACKGROUND

During the early morning hours of November 24, 2016, at around 3:00 a.m., Michael Garcia, Dominique Schiller, and Neida Queme heard shouting and screaming coming from outside of their second-floor hotel room at a Motel 6 in Plano, Texas. They looked out the window of their room and saw a young man (later identified as appellant) "dragging" a woman (later identified as Maribel Sandoval) through the parking lot. Sandoval was crying and it did not appear as though

she wanted to go with appellant.

The three individuals left their hotel room and ran downstairs to ask Sandoval if she was okay. She said "no." They saw that she was crying, had bruises on her face, and looked "beat up." As appellant dragged Sandoval up the stairs, Garcia, Schiller, and Queme followed. Appellant told the three to leave them alone and said Sandoval was drunk. When appellant and Sandoval went into their room, Garcia testified that he saw appellant hit Sandoval's face with his fist. He added that the hit was not gentle and that it "looked pretty hard." Schiller and Queme said they did not see appellant hit Sandoval. Appellant and Sandoval went into their room and appellant cursed at Garcia, Schiller, and Queme, and slammed the door. Garcia testified that they could hear Sandoval crying. They returned to their room to retrieve a cell phone. Schiller called the police.

Officers with the Plano Police Department soon arrived and knocked on appellant's hotel room door. There was no answer. One of the officers retrieved a key from the hotel office and, after getting it, the officers announced themselves and entered the hotel room. They did not see anyone in the room when they first entered, but they heard what sounded like running water coming from the bathroom, and the bathroom door was shut. Inside the bathroom, the officers found appellant standing near the toilet. Sandoval was sitting in the shower with the water running. She was fully clothed. Appellant appeared to be highly intoxicated and was angry with the officers, who removed him from the bathroom and detained him. Appellant was ultimately arrested and charged with assault.

Heather Anderson, a criminalist with the Plano Police Department, was called to the hotel and photographed the crime scene on November 24, 2016. Anderson's photos were admitted into evidence at trial. She photographed the parking lot, Sandoval's car, and the exterior and interior of the hotel room. In Sandoval's car, Anderson photographed several areas that showed dried and

–2–

wet bloodstains. She found clothing items in the car with bloodstains on them, and Anderson saw blood on the wall right outside the door to appellant's hotel room. Inside the hotel room, she observed bloodstains on the bed sheets and what appeared to be blood in and around the bathroom sink. Anderson also photographed Sandoval, who had injuries on her face. She appeared to have bruising above both eyes, one of her eyes was red, and she had several scratches on her cheeks, nose, and forehead. There were bloodstains on her clothes. Anderson saw pink and/or red marks on the side of Sandoval's back and on her left arm.

Detective Justin Lawrence with the Plano Police Department's Family Violence Unit was assigned to the case. He interviewed appellant on November 25, 2016, the day after appellant's arrest. This interview was recorded and a redacted version (in which the audio was muted during certain parts of the interview) was admitted into evidence. In the interview, appellant told Lawrence that he slapped Sandoval only once on the day in question and this occurred when they were at a park in south Dallas. He slapped her with the back of his hand. She already had bruises on her face because he had hit her on another occasion, prior to that day. He also told Detective Lawrence that he drove Sandoval to the hotel in Plano that night. In the car, Sandoval was telling appellant she loved him, but when they got out of the car at the hotel, she took off. He chased her and tried to calm her down. He helped her get up off the ground and they walked to the hotel room "side by side." She was still crying and "running her mouth." When Garcia, Schiller, and Queme approached, appellant said that he told them she was just drunk. They wanted to talk to Sandoval; she ignored them. The three tried to follow appellant and Sandoval into their hotel room, but he closed and locked the door. Once inside the room, Sandoval undressed and got in the shower. He went into the bathroom to check on her, and she apologized to him. The police kicked down the door and entered the room without permission.

Detective Lawrence met with Sandoval on November 28, 2016, four days after the offense.

Lawrence testified that Sandoval looked "pretty beat up." She had bruises all over her face and one eye was bloodshot. Sandoval told him appellant hit her in Dallas and in Plano on the night in question, and she indicated that appellant hit her several times with his fist over a two-day period.

Prior to trial, the court had granted the State's motion (discussed more fully in appellant's second issue) to allow the State to introduce Sandoval's two handwritten statements, which were admitted at trial as State's exhibits 3 and 4. Exhibit 3, Sandoval's statement from November 28, 2016, as read to the jury by Detective Lawrence, was as follows:

> Tuesday, November 22nd, and Wednesday, November 23rd, I was assaulted by Jhovanny Espinoza, who struck me in the face several times as I was driving. I was just trying to leave, after he hit me several times, to go get help, because he wouldn't stop, and he kept threatening to kill me and continuing hurting me.

Lawrence was also asked to read aloud exhibit 4, Sandoval's statement from November 24, 2016, the day of the offense, and his testimony was as follows:

> Jhovanny Espinoza has struck me several times with his fist over the past two days. On my face, first the right, then the left, bruising my nose, cheeks, eyes. He repeatedly threatened to kill me and bite my face off. He told me if I tried running, that would be the end of me. Felt scared so—I can't read that word—so run then since people came to ask if I was okay. I nodded no and they stayed outside the door—some of this is hard to read—me and told me I had messed up. He began telling me and I cleaned myself up but in the process struck me once again in the face, threw me to the floor, kicked my left side of my body, pulled me into the restroom to clean myself up before everyone showed up. That's when we heard the knocks on the door.

Sandoval did not testify for the State but she testified in appellant's defense. She told the jury that appellant—the father of her child and a person with whom she had had an on-and-off dating relationship—never assaulted her in the hotel room and that she only told the police appellant threw her down, kicked her, and pushed her into the bathroom because she "was angry." She said she was never dragged across the hotel parking lot. Sandoval testified that appellant had struck her with his fists several times over the two days prior to the incident, when they were in Dallas, and when they got to the hotel she "just decided to like run off and walk off." She had

–4–

been drinking that night, so appellant followed her and told her to calm down. She threw herself to the ground, and he grabbed her arm to get her back up. Appellant was just trying to "get me up off the ground." She was cursing at appellant and screaming at him, and he told her to calm down because she "was just going all crazy on him." He was calmly telling her to get up and that they should go back to the motel room. She decided to get up, and appellant walked with his arm around her. They were walking together and appellant was beside her the entire time. Sandoval said that from the time they sat down outside of the nearby restaurant until they were walking to their hotel room, appellant never struck her, nor did he injure her. Sandoval speculated that Garcia, Schiller, and Queme may have been concerned because she kept throwing herself to the ground, but she never said anything to them or shook her head "no" when they asked her if she was okay.

Sandoval testified that the blood in the car was from her nose. She explained that she and appellant had been in Dallas earlier in the evening on the night of the offense, and that appellant had hit her multiple times. She said her nose "bleeds a lot." She testified that she had found pictures of another girl on appellant's phone and confronted him about the photographs. She hit him; he slapped her. They hit each other "like on and off," but it all happened in Dallas County. She denied that appellant ever told her not to accept a subpoena. Sandoval also denied she was clothed in the shower when the police arrived. Sandoval testified that some of the things she wrote in State's exhibit 4 were true, and some were false.

Jessica Baca, a victim advocate for the Plano Police Department, testified that she first started working with Sandoval in 2012, and that she had provided services to Sandoval in the past. Sandoval and appellant had a young child together, and Sandoval did not have a lot of family or financial support other than appellant. Baca believed Sandoval was dependent upon appellant. Prior to trial, Baca made several attempts to contact Sandoval by phone, email, and through family members, but Sandoval did not respond.

Robin Laughon, an investigator with the Collin County District Attorney's Office, testified that she made several attempts to locate Sandoval and secure her presence for trial. Laughon also listened to jail telephone calls between appellant and Sandoval. During those calls, appellant and Sandoval would switch back and forth from Spanish to English, but Laughon, who understood "a little bit of Spanish" but did not speak it, could only testify to the English portions of their conversations. Laughon testified that appellant's tone during the calls and instructions he gave Sandoval led her to believe appellant was instructing Sandoval to avoid getting served with a subpoena.

The State also called Dr. Christy Sim, executive director of "Stronger than Espresso," an organization dedicated to providing services to victims of family violence and sexual assault and expert training to professionals. Dr. Sim testified regarding how power and control are central in an abusive relationship and how it could affect a victim of domestic violence. And she testified in rebuttal, after observing Sandoval's testimony, that Sandoval was "minimizing," blaming herself, and taking "responsibility for everything." She added that the testimony she witnessed was consistent with the behaviors she testified about.

Appellant testified in his own defense, denying that he had attempted to hide Sandoval from the District Attorney's Office. He testified that he and Sandoval had visited a friend in Dallas on the night of the offense. He hit her three times while they were in Dallas: The first time was when he slapped her two days before the offense; the second time was when he hit her in front of his friend in Dallas; the third was when he "backhanded" Sandoval in the car while they were driving—still in Dallas. He said he did not hit Sandoval, strike her, or push her when they arrived in Collin County. Appellant said Sandoval provoked him and also hit him, and he and Sandoval hit each other during the drive to Plano, stopping right before they reached Mockingbird Lane. He hit her first in South Dallas, but in North Dallas—before they got to Mockingbird—she was hitting

him while he was driving, which caused him to "kind of swerve," and that was why he "backhanded" her. He testified that Sandoval had calmed down by the time they reached Mockingbird, in Dallas. They did not hit each other after that.

The blood in the car belonged to both of them, according to appellant. He said his nose was bleeding because Sandoval had hit him. Appellant further testified that when they reached the hotel in Plano, Sandoval, who was drunk, got out of the car and "took off," and he went after her. He testified that Sandoval walked back by herself—he just had his arm around her. Appellant said the blood on the bed must have been from when he was apprehended because his gums had been bleeding and he spit the blood into the sink.

The State also introduced evidence that appellant had been previously convicted of assault family violence, as alleged in the indictment. The jury ultimately convicted him of the charged offense and assessed punishment at five years' imprisonment. This appeal followed.

## DISCUSSION

### 1. Article 38.371

In his first issue, appellant contends the trial court abused its discretion in allowing the State to introduce evidence to the jury during the guilt/innocence phase of the trial under article 38.371 that allegedly did not meet the requirements of the statute. The State argues that appellant waived his objections to the trial court's ruling and, even if they were not waived, the trial court did not abuse its discretion.

In the defendant's motion for redactions of statements made by the defendant, appellant listed twenty-two separate objections to specified portions of his one-hour-and-six-minute recorded statement to Detective Lawrence and time stamps for each objected-to portion of the interview, along with specified reasons for each requested redaction. During a pretrial hearing on appellant's motion, appellant withdrew his fourth request and the State agreed to all but four of

–7–

the others—request 7 and requests 14, 15, and 16. In his request 7, appellant objected to his statement (13.35 to 14.00 on the video) about a prior assault in which he struck Sandoval on a prior occasion—more specifically, his statement to Detective Lawrence that her face was already bruised when they got to the hotel because he had hit her previously. In request 15, appellant objected to his statements (42.45 to 43.00) to Detective Lawrence that he thought Sandoval may have wanted him to put his hands on her. Appellant added that he did not always think about putting his hands on Sandoval. It would just happen and "after so long" he would "just get fed up." In request 16, appellant objected to his statement (47.15 to 47.30) to Detective Lawrence that he may have caused a "little bruise" with his knuckle when he slapped Sandoval with the back of his hand that night, but her other injuries were from before.[1]

During the hearing, the State argued the information was admissible under article 38.371 to show the nature of the relationship between Sandoval and appellant because it pertained to Sandoval's injuries at the time of the investigation, and because it showed a continuing course of conduct. The trial court reviewed the portions of the video specified in appellant's requests and overruled each of the requested redactions. The redacted version of the recording was admitted into evidence and played in court.

The State argues that appellant waived any complaint he may have had regarding the trial court's ruling on requests 7, 15, and 16 because defense counsel affirmatively elicited the same information from Detective Lawrence during cross-examination and from Sandoval and appellant during appellant's case-in-chief. *See Bartee v. State*, Nos. 05–07–01437–CR, 05–07–01438–CR, 2008 WL 4743490, at *3 (Tex. App.—Dallas Oct. 30, 2008, no pet.) (mem. op., not designated for publication) (citing *Rogers v. State*, 853 S.W.2d 29, 35 (Tex. Crim. App. 1993) (op. on reh'g))

---

[1] Appellant's objection in request 14 (37.35 to 40.34), which is not part of his first issue, was that the objected-to portion of the interview contained hearsay statements by Sandoval "about a prior occurrence when there was a prior dispute and prior injuries from another incident and prior assaults that occurred by and between the parties."

("When, as here, evidence similar to the complained-of evidence is admitted elsewhere at trial without objection, any error in admitting the complained-of evidence is waived."). We need not resolve this question. Even if we assume appellant's complaint was preserved, there was no abuse of discretion.

A trial court's decision to admit evidence of prior crimes, wrongs, or bad acts is reviewed for an abuse of discretion. *Powell v. State*, 63 S.W.3d 435, 438 (Tex. Crim. App. 2001); *Gonzalez v. State*, 541 S.W.3d 306, 310 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "This standard requires that we affirm admissibility rulings when they are within the zone of reasonable disagreement." *Gonzalez*, 541 S.W.3d at 310.

The State may not introduce evidence of a defendant's prior crimes, wrongs, or other acts for the sole purpose of showing his character and that he acted in conformity with that character on a particular occasion. TEX. R. EVID. 404(b); *Smith v. State*, 5 S.W.3d 673, 678 (Tex. Crim. App. 1999). If offered for a purpose other than character conformity, the evidence may be admissible. *Smith*, 5 S.W.3d at 678. Permissible purposes listed in rule 404(b) include motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. TEX. R. EVID. 404(b); *Smith*, 5 S.W.3d at 678. But "this list is not exhaustive." *Garcia v. State*, 201 S.W.3d 695, 703 (Tex. Crim. App. 2006). Evidence of another crime, wrong, or act also may be admissible as "same-transaction contextual evidence" if several crimes "'are intermixed, or blended with one another, or connected so they form an indivisible criminal transaction,'" and full proof by testimony "'of any one of them cannot be given without showing the others.'" *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011) (quoting *Wyatt v. State*, 23 S.W.3d 18, 25 (Tex. Crim. App. 2000) (quoting *Rogers v. State*, 853 S.W.3d 29, 33 (Tex. Crim. App. 1993))). However, this "same-transaction contextual evidence is admissible only when the offense would make little or no sense without also bringing in that evidence," and only to the extent it is necessary

to the jury's understanding of the offense. *Id.*

Article 38.371 of the Code of Criminal Procedure provides, for certain family violence offenses, including the one for which appellant was convicted:

> (b) In the prosecution of an offense described by Subsection (a), subject to the Texas Rules of Evidence or other applicable law, each party may offer testimony or other evidence of all relevant facts and circumstances that would assist the trier of fact in determining whether the actor committed the offense described by Subsection (a), including testimony or evidence regarding the nature of the relationship between the actor and the alleged victim.

> (c) This article does not permit the presentation of character evidence that would otherwise be inadmissible under the Texas Rules of Evidence or other applicable law.

TEX. CODE CRIM. PROC. ANN. art. 38.371.

We have stated that article 38.371 "allows testimony concerning the nature of the relationship between the actor and the victim." *Mapolisa v. State*, No. 05–16–00711–CR, 2017 WL 2952994, at *5 (Tex. App.—Dallas July 11, 2017, pet. ref'd) (mem. op., not designated for publication). In *Gonzalez*, the Fourteenth Court of Appeals discussed the statute in detail, concluding that, in family violence cases, "[t]he nature of the relationship between the actor and the alleged victim may be relevant to, among other things, confirm the alleged victim's initial— and later recanted—statements to police, or to explain the alleged victim's unwillingness to cooperate with law enforcement or prosecution." *Gonzalez*, 541 S.W.3d at 312. "Neither use contravenes Rule 404(b)'s prohibition against use of character-conformity or propensity evidence." *Id.*

We conclude it was well within the zone of reasonable disagreement for the trial court to have found in this case that the disputed evidence was admissible for a non-character-conformity purpose. Appellant's argument is that article 38.371 can only be used to prove "the required relationship element in a family violence case," and that evidence of prior bad acts is not admissible under article 38.371 unless it is for a specified purpose under rule 404(b) or invited.

–10–

But the notion that article 38.371 could only be used to prove the relationship element in a family violence case runs afoul of plain language of the statute—not to mention the holdings in *Gonzalez* and other cases. *See Gonzalez*, 541 S.W.3d at 312–13 (complaint from appellant's prior assault conviction against same victim admissible under article 38.371 to explain victim's recantation and to rebut appellant's defensive theory that victim had initially fabricated the allegations); *Nash v. State*, Nos. 02–17–00236–CR, 02–17–00237–CR, 2018 WL 4495440, at *6 (Tex. App.—Fort Worth Sept. 20, 2018, no pet.) (mem. op., not designated for publication) (citing *Gonzalez* and concluding appellant's prior violence and nature of his relationship with victim was relevant to explain why her trial testimony differed from her statements to police and to the nurse examiner and was more than mere character-conformity evidence). Similarly, appellant's statements to Detective Lawrence in this case were relevant to explain why the State believed Sandoval would not testify at trial. Moreover, the nature of the victim's relationship with appellant and, additionally, appellant's statements that he repeatedly assaulted her in the days prior to the offense, were relevant to explain her apparent unwillingness to cooperate with law enforcement and the prosecution. *See Gonzalez*, 541 S.W.3d at 312–13.

Appellant's argument that prior bad acts are inadmissible under article 38.371 unless they are admitted for a specified purpose under rule 404(b) or invited is likewise unfounded and is contrary to the Court of Criminal Appeals' holding that, based on the clear language of the rule, the list in rule 404(b) is "not exhaustive." *See Garcia*, 201 S.W.3d at 703. Furthermore, the court has held in the context of a similar statute, article 38.36, which pertains to evidence in prosecutions for murder, that "in cases in which the prior relationship between the victim and the accused is a material issue, illustrating the nature of the relationship may be the purpose in which evidence of prior bad acts will be admissible." *Id.*; *see also Gonzalez*, 541 S.W.3d at 311 n.4 (discussing article 38.36 and other similar statutes, e.g., articles 38.37 (evidence of extraneous offenses or acts), 38.46

(evidence in prosecutions for stalking), and 38.48 (evidence in prosecution for tampering with witnesses or prospective witness involving family violence)). Accordingly, the trial court did not abuse its discretion in overruling appellant's requested redactions because the State offered the evidence for a purpose other than character conformity. We overrule appellant's first issue.

## 2. Article 38.49

In his second issue, appellant argues the trial court abused its discretion in allowing the State to introduce evidence to the jury during guilt/innocence under article 38.49 that did not meet the requirements of the statute, thereby violating the Confrontation Clause.

A defendant in a criminal prosecution has a Sixth Amendment right to be confronted with the witnesses against him. *Giles v. California*, 554 U.S. 353, 357–58 (2008); *Gonzalez v. State*, 195 S.W.3d 114, 116 (Tex. Crim. App. 2006); *Shepherd v. State*, 489 S.W.3d 559, 573 (Tex. App.—Texarkana 2016, pet. ref'd). Even though a hearsay statement offered against the defendant may be otherwise admissible under the rules of evidence, the Confrontation Clause may be implicated if the defendant has not had the opportunity to confront the out-of-court declarant. *Gonzalez*, 195 S.W.3d at 116; *Shepherd*, 489 S.W.3d at 573. But declarations made by a declarant whose unavailability the defendant procured may be admitted as an exception even though the defendant did not have an opportunity to confront the declarant. *Shepherd*, 489 S.W.3d at 573.

Under forfeiture by wrongdoing, the defendant is barred from asserting his right of confrontation when he has wrongfully procured the unavailability of the witness. *Id.* Under *Giles*, this exception applies "only when the defendant engaged in conduct *designed* to prevent the witness from testifying." *Giles*, 554 U.S. at 359; *Shepherd*, 489 S.W.3d at 573. The Supreme Court requires there must be some showing by the proponent of the statement that the defendant intended to prevent the witness from testifying. *Giles*, 554 U.S. at 361–62; *Shepherd*, 489 S.W.3d at 573. "[F]orfeiture by wrongdoing applies even when the defendant has multiple reasons for

harming the witness, so long as one of the reasons is to prevent her from testifying." *Shepherd*, 489 S.W.3d at 573. Forfeiture by wrongdoing may apply "even though the act with which the accused is charged is the same as the one by which he allegedly rendered the witness unavailable." *Gonzalez*, 195 S.W.3d at 125; *Shepherd*, 489 S.W.3d at 573.

The Supreme Court has also stated that the doctrine of forfeiture by wrongdoing has particular relevance in domestic violence cases:

> Acts of domestic violence often are intended to dissuade a victim from resorting to outside help, and include conduct designed to prevent testimony to police officers or cooperation in criminal prosecutions. Where such an abusive relationship culminates in murder, the evidence may support a finding that the crime expressed the intent to isolate the victim and to stop her from reporting abuse to the authorities or cooperating with a criminal prosecution—rendering her prior statements admissible under the forfeiture doctrine. Earlier abuse, or threats of abuse, intended to dissuade the victim from resorting to outside help would be highly relevant to this inquiry, as would evidence of ongoing criminal proceedings at which the victim would have been expected to testify.

*Giles*, 554 U.S. at 377.

Article 38.49 of the Texas Code of Criminal Procedure "is a codification of the forfeiture by wrongdoing doctrine, and its requirements substantially correspond to those set out in *Giles*." *Schindler*, 2018 WL 4924946, at *3; *see also Shepherd*, 489 S.W.3d at 574 ("[T]he requirements of Article 38.49 substantially correspond with the requirements for forfeiture by wrongdoing set out in *Giles*."). Article 38.49 provides in part as follows:

> (a) A party to a criminal case who wrongfully procures the unavailability of a witness or prospective witness:
>
> > (1) may not benefit from the wrongdoing by depriving the trier of fact of relevant evidence and testimony; and
> >
> > (2) forfeits the party's right to object to the admissibility of evidence or statements based on the unavailability of the witness as provided by this article through forfeiture by wrongdoing.
>
> (b) Evidence and statements related to a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of a witness or prospective witness are admissible and may be used by the offering party to make a showing of forfeiture by wrongdoing under this article, subject to Subsection (c).

–13–

(c) In determining the admissibility of the evidence or statements described by Subsection (b), the court shall determine, out of the presence of the jury, whether forfeiture by wrongdoing occurred by a preponderance of the evidence. If practicable, the court shall make the determination under this subsection before trial using the procedures under Article 28.01 of this code and Rule 104, Texas Rules of Evidence.

(d) The party offering the evidence or statements described by Subsection (b) is not required to show that:

> (1) the actor's sole intent was to wrongfully cause the witness's or prospective witness's unavailability;

> (2) the actions of the actor constituted a criminal offense; or

> (3) any statements offered are reliable.

TEX. CODE CRIM. PROC. ANN. art. 38.49.

We review the trial court's decision admitting or excluding evidence under article 38.49 for abuse of discretion. *See Shepherd*, 489 S.W.3d at 572; *Thompson v. State*, No. 10–16–00238–CR, 2017 WL 3182988, at *1 (Tex. App.—Waco July 26, 2017, no pet.) (mem. op., not designated for publication); *see also Schindler v. State*, No. 02–17–00241–CR, 2018 WL 4924946, at *5 (Tex. App.—Fort Worth Oct. 11, 2018, no pet.) (mem. op., not designated for publication). A trial court abuses its discretion when its decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *Shepherd*, 489 S.W.3d at 572.

The record shows that, prior to jury selection on the first day of trial, the trial court held a hearing on the State's oral motion requesting a forfeiture by wrongdoing pursuant to article 38.49 of the Texas Code of Criminal Procedure. The State moved to introduce during trial statements made by Sandoval, arguing that appellant engaged or acquiesced in wrongdoing to prevent her from testifying. The State also argued that under article 38.49 it did not have to prove appellant's sole intent was to commit a criminal offense or cause her unavailability, or that he actually threatened her.

Robin Laughon was the State's only witness at the hearing, and she testified about her

–14–

efforts to "locate" Sandoval and "secure" her attendance as a witness at trial. Laughon testified that she attempted to do this on several occasions and at various places beginning in March of 2017, two months before trial. In addition to sending text messages to different phone numbers Sandoval used and attempting to contact Sandoval's mother, Olga, Laughon said she went to the jail during a time when Sandoval usually visited appellant. Laughon also went, on at least three occasions, to a residence she believed Sandoval was using. When Laughon went to the residence she left her card, making it clear she was from the district attorney's office and that she wanted to speak with Sandoval. Additionally, Laughon attempted to locate Sandoval at her children's school during a time when she should have been picking them up.

Laughon testified that she listened to "numerous" recorded jail telephone calls between appellant and Sandoval. During those calls, Laughon heard what she believed were attempts by appellant to convince Sandoval to "lay low" and avoid service. Laughon recounted examples of appellant's conduct that led her to conclude that was what he was actively trying to do—e.g., encouraging Sandoval not to take any type of employment until after the trial concluded; telling her to use "apps" and/or change her telephone number so she could not be contacted; and encouraging her to move around and not stay in one place.

Laughon detailed the contents of some of the telephone calls that she listened to, including one that was recorded on December 4, 2016, not long after appellant's arrest:

> I heard him say you are already messing up, you need to keep that phone with you at all times. If you are down for me, you have got to do what I say. You are going to do what you are supposed to do, the right thing.

> And then, you know, throughout the phone call, he is trying to convince her to move in with his parents, saying play your cards right, say you made a mistake, say you don't know what got into you. As long as you are honest, you will be fine. What do you think about that? I am laying it down for you, I am showing you the game. You know what I am saying? All you have got to do is do it. These are big cases.

Appellant also told Sandoval to change her telephone number, and she did this at least three to five

times.

During another call recorded on April 15, 2017, a month before trial, appellant again told Sandoval to change her telephone number, and Sandoval responded that she could only change it every fifteen days. Appellant pressed Sandoval to change her phone number with T-Mobile on the following Monday. When she refused, appellant responded as follows, according to Laughon's testimony:

> And, he says, I feel like you are doing this shit on purpose. And she is, like, no, I'm not. Why would you think I am doing this on purpose? I feel like you are on their side or some shit. And then, he says, the number, the number, what else, man? The 214 number. And, she says, that makes no F'g sense.

> And, he said, how does it not make sense? Monday, go and change the 214 number. If I have to call this bitch, you need to change it up. And, she says, I am not changing it. I am not changing it. And, he says, why the fuck not? And, she said, because why would I do that? Because I am telling you to do it. I am not—and, she says, I am done talking to you. And then, he says—he gets angry and, he says, are you for real, N-word? Are you for real?

Appellant also told Sandoval:

> He says, well, then, damn, why do you think I am telling you to fucking change it? Because I called you from here, it's no—no, it is a fucking iPhone; it is no bullshit little safe phone or no app shit. You get it? Talk to me like you are. What's up?

> She said, why would I do that? It is just not working. He says, that number don't have nothing to do with the other number; and if you change the number, then I don't got to worry about you no more. I mean, I don't know how much specific you want me to get. I don't know why you want to keep this number so fucking bad. You know what I am saying.

> And, she said, because if I have to change it at the doctor's office—or at the doctor's, at Medicaid, and with the kids' school. And, he says, it ain't nothing but giving them a phone call. Fine, if you want to keep it, then keep it. But when something pops up, this is my ass, not yours. You don't seem to fucking care. You don't take this serious. This is serious. This is life.

Sandoval gave appellant her new telephone number that they used for the "next few calls." In addition, appellant gave Sandoval specific instructions about what she needed to do with her Facebook page, and he told her that she had better not be talking to or having conversations with anyone.

On April 29, 2017, about two weeks before trial, appellant instructed Sandoval to "keep an eye out." During a portion of the conversation where they were speaking in Spanish, Sandoval mentioned "that Robin," and appellant told her she needed to move around. Appellant reiterated his instruction not to speak to anyone during a telephone call from May 10, 2017, the week before trial. Laughon testified that she continued listening to the calls to find other addresses or telephone numbers Sandoval might be using.

Appellant also tried to dictate Sandoval's work schedule. In one telephone conversation, Sandoval commented that appellant did not want her to get a job, and he replied that "you know why." In a conversation recorded on May 9, 2017, six days before the hearing, Sandoval informed appellant that she had received several emails about a job, and he told her not to start until after May 20th. Laughon noted that by this time appellant's trial would have concluded.

During another phone conversation recorded on May 9, 2017, appellant told Sandoval to not accept letters or envelopes, and he again encouraged her to move around. Laughon summarized this conversation as follows:

> So, she says, I keep reading Bible verses to stay focused. And, he says, to not worry. And she is, like, it is just not happening. As much as I keep talking myself out of it, it is just not happening. And then, she said, I messaged your mom, and then she starts speaking in Spanish. And then, he says, don't be accepting a letter. You know what I am saying?
>
> And then she speaks Spanish again. And then, she says, you don't even understand. And, he says, just be careful, you know? The clock is ticking. You know what I am saying? There is more Spanish. And then, he says, the opportunity. You know what I'm saying? And then she responds in Spanish.
>
> And then, he says, be careful, you know. Another Spanish response. And then back to English, don't be accepting an envelope. Do you know what I'm saying? And, she says, I've got it, I am not stupid. And, he says, well, you are not untouchable. You shouldn't be trying to argue with me. Do you know what I'm saying? And, she said, trust and believe.
>
> And, he says, it doesn't always work like that. You have got to prepare yourself, you have got to stay ready, you have got to get ready. And then there is Spanish. And, he said, I would feel more comfortable if you had already taken care of it.

–17–

You know what I'm saying? And then Spanish conversation. And how do you— or how are you doing or where you at? You know what I'm saying? And then Spanish.

And then, he says, what the fuck do I have to do to make this shit happen? Do I got to get on people's asses to make this shit happen? Spanish conversation. And then, he says, make it happen. You know what I'm saying?

And, she says, I know, but you have to understand I am not going to take it back. I said what I meant and I am not taking it back. And, he says, there is no—there is no way in hell you can take it back, but something out of anger. I get the point, I just don't like the principle, the way you are being. I don't like that shit.

And, she said, I am sticking up for you and defending you. Your life is on the line and they are bullshitting. And then he speaks in Spanish and says, cut me a break. I am the only one going through this shit. That's all there is to it.

During many of the calls appellant often got angry with Sandoval, particularly when she resisted his demands. And when appellant became angry, Sandoval appeared to be compliant with whatever he wanted her to do. Laughon testified that she believed Sandoval was not in court because of the prior history of family violence, and this belief was based on the calls Laughon heard. She admitted that she did not hear appellant specifically tell Sandoval to not "testify" or accept "service of process," nor did she hear any specific threats towards Sandoval not to testify.

The jail telephone calls to which Laughon testified were admitted into evidence for the hearing; they were not published. Laughon agreed she did not know for certain what appellant meant on several occasions during the calls, or if she had the correct email address or physical address for Sandoval. She never spoke to Sandoval or her mother.

The State also offered into evidence police reports from previous violent incidents involving appellant, Sandoval's written statement from the night of the offense, and photographs of Sandoval showing injuries such as a cut on her lip and bruises on her face and arm. Sandoval wrote in her statement from the night of the offense that appellant had assaulted her over the past two days and "repeatedly threatened to kill me and bite my face off." "He told me if I tried running that would be the end of me." She said she ran away because she was scared. In February of 2016,

according to a Plano Police Department incident/arrest report, appellant slapped Sandoval in the face, punched her on the left leg, and grabbed her arm. He then drove away in her car, leaving her behind. In August of 2016, appellant kicked in Sandoval's front door when she refused to let him in. According to the Plano Police Department's incident/arrest report, appellant was angry with Sandoval for not answering his calls. When Sandoval's mother told him to leave, he threw a frying pan through a window and threatened to hit her. In November of 2016, Plano Police were called when appellant threatened to damage Sandoval's car if she did not let him into the house. The incident/arrest report stated that Sandoval told police appellant had a history of assaulting her and verbally abusing her.

At the conclusion of the hearing, appellant objected to the State's motion under *Crawford v. Washington*, 541 U.S. 36 (2004), arguing the State did not meet their burden, it did not prove due diligence to procure Sandoval, nor was appellant provided with sufficient notice. The trial court granted the State's motion for forfeiture by wrongdoing under article 38.49, finding from the totality of the evidence presented that the State had met its burden by a preponderance of the evidence.

During the trial, appellant made various *Crawford*-based objections, objecting under the Confrontation Clause and *Crawford* to State's exhibit 3 and exhibit 4. Appellant made the same objection to the following State's question to Detective Lawrence: "And, in fact, did she describe a one-time pop in the nose that caused her to bleed, or did she indicate to you that he hit her several times over the course of this period?"[2] Appellant made a similar objection during the testimony of Heather Anderson, objecting under *Crawford* to the following question posed by the State: "And did she indicate that there were [injuries covered by her clothing]?" The trial court overruled all of these objections. In addition, appellant made the following *Crawford* objections during the

---

[2] Appellant also made a hearsay objection to this question.

–19–

testimony of Jessica Baca:

> Q. [STATE:] And do any of those children, has she had—has she had any children with Jhovanny Espinoza?
>
> A. [BACA:] Yes. The last time I spoke with her, she stated she had—
>
> [DEFENSE COUNSEL:] Your Honor, I would object under *Crawford v. Washington*.
>
> THE COURT: Overruled.
>
> Q. Please answer the question.
>
> A. Yes, she has a two-month-old, or she had a 21 two-month-old when I spoke to her.
>
> Q. And have you had conversations with Maribel about her relationship with Jhovanny Espinoza?
>
> A. I have, yes.
>
> [DEFENSE COUNSEL:] Your Honor, once again, I am going to object under *Crawford v. Washington*.

Arguing the trial court's ruling violated his constitutional right of confrontation, appellant first claims the State did not comply with article 28.01, which allows the trial court to set a pretrial hearing and states that any matter not raised or filed seven days prior to the hearing will not be allowed to be raised or filed, except with the permission of the court upon good cause shown. *See* TEX. CODE CRIM. PROC. ANN. art. 28.01. Article 38.49, however, directs the trial court to follow article 28.01 "[i]f practicable." *See id.* art. 38.49(c). Moreover, the Court of Criminal Appeals has held that article 28.01 is not a mandatory statute; it is one directed to the court's discretion. *See Calloway v. State*, 743 S.W.2d 645, 649 (Tex. Crim. App. 1988); *Cantu v. State*, 546 S.W.2d 621, 621 (Tex. Crim. App. 1977). And when, as in this case, the pretrial matter is heard on the day designated for trial on the merits, the hearing is outside the scope of article 28.01. *See State v. Velasquez*, 539 S.W.3d 289, 294 (Tex. Crim. App. 2018) (holding a motion to suppress held the morning that trial on the merits commenced fell outside the orbit of article 28.01).

Appellant next argues the court erred because the State failed to show Sandoval was legally unavailable as a witness. To establish a witness is unavailable under rule 804(a)(5), which creates an exception to the rule against hearsay when the declarant "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *see* TEX. R. EVID. 804(a)(5), the proponent of the testimony must show that a good-faith effort was made before trial to locate and present the witness. *Reed v. State*, 312 S.W.3d 682, 685 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd) (investigator interviewed family and friends of witness, none of whom knew where she was); *Wise v. State*, No. 11–11–00196–CR, 2013 WL 3583954, at *7 (Tex. App.—Eastland July 11, 2013, no pet.) (mem. op., not designated for publication) (investigators attempted unsuccessfully to serve witness several times at his last known address, contacted his attorney, bail bondsman, and family members). "Similarly, 'unavailability' for purposes of the Confrontation Clause is established if the prosecution has made a good-faith effort to obtain the witness's presence at trial." *Reed*, 312 S.W.3d at 685. "The State is not required to engage in clearly futile activities before a trial court can, in its discretion, determine that the State made good-faith efforts to produce a witness at trial." *Ledbetter v. State*, 49 S.W.3d 588, 594 (Tex. App.—Amarillo 2001, pet. ref'd).

There is ample evidence in the record to show that the State made the requisite good-faith effort to secure Sandoval's presence at trial. Appellant argues that the State did not even apply for, much less secure, a subpoena for Sandoval's presence at trial. Appellant also alleges that the State "committed a fraud on the court" by repeatedly stating during the hearing that Sandoval was avoiding service, and by "allowing Laughon to repeatedly testify that she was attempting to 'serve' Sandoval with a subpoena," when this was not the case.

Although there is no application for a subpoena for Sandoval in the clerk's record, the record shows that, in addition to sending text messages to different phone numbers Sandoval used

–21–

and attempting to contact Sandoval's mother, Laughon attempted to locate Sandoval at the jail during a time when Sandoval typically visited appellant. Laughon also went, on at least three occasions, to a residence that she believed Sandoval was using, and when Laughon went to the residence she left her card. Moreover, Laughon attempted to locate Sandoval at her children's school, and listened to jail telephone calls between appellant and Sandoval to find other addresses or telephone numbers Sandoval might be using.

As the Supreme Court has observed, "We have never held that the prosecution must have issued a subpoena if it wishes to prove that a witness who goes into hiding is unavailable for Confrontation Clause purposes." *Hardy v. Cross*, 565 U.S. 65, 71 (2011) (per curiam). Furthermore, "when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising." *Id*. at 71–72 (2011) (citation omitted); *see also California v. Green*, 399 U.S. 149, 188–89 n.22 (1970) (Harlan, J., concurring).

Regarding the assertion that Laughon testified untruthfully about attempting to serve Sandoval, Laughon stated that she repeatedly attempted to secure Sandoval's attendance at trial, and that she was ultimately unable to serve Sandoval with a subpoena. The existence of a subpoena does not seem to have been an issue at the hearing, however. Neither counsel nor the court inquired about why—if, in fact, she did not have a subpoena to serve—Laughon stated that she was attempting to serve Sandoval. The record shows appellant had set for trial with the current case two other related cases—sexual assault and aggravated kidnapping—that were dismissed after the pretrial hearing, only a few days before trial. The court could have reasonably inferred that a subpoena for Sandoval was issued in one of those other two cases. In any event, based on the standard of review we must follow, we defer to the trial court's discretion on such matters because

it was judge of the credibility of the witnesses and the weight to be given to their testimony. *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Schindler*, 2018 WL 4924946, at *7. We conclude the trial court did not abuse its discretion in ruling Sandoval was unavailable for the purposes of article 38.49 and the Confrontation Clause.

Appellant also argues that even if the State could show unavailability, it did not prove he acted with an intent designed to keep Sandoval from testifying at trial. He argues the State failed to meet its burden because he never specifically threatened Sandoval to keep her from testifying or specifically told her to avoid service, and the State merely asked the court to infer through several different actions that appellant encouraged Sandoval to avoid service. Appellant calls our attention to Laughon's testimony that she did not have any "concrete evidence" appellant wrongfully procured Sandoval's unavailability.

Viewing the evidence and all of the reasonable inferences therefrom, the record easily supports the finding that appellant wrongfully procured Sandoval's unavailability as a witness. Though there is no evidence of a *direct* threat or command from appellant to Sandoval to avoid service or to not appear in court, the record is replete with evidence that this is precisely the outcome appellant intended. Indeed, appellant repeatedly encouraged and/or cajoled Sandoval to avoid trial. The references to "big cases" and Sandoval's reference to "that Robin," for example, as well as the overall context of the conversations between Sandoval and appellant, show that Sandoval and appellant were discussing the trial in this case. Also, there is a history of domestic violence involving appellant. *See Tarley v. State*, 420 S.W.3d 204, 206 (Tex. App.—Houston [1st Dist.] 2013, pet. refused) (recognizing *Giles*' understanding that domestic violence is often intended to dissuade a victim from seeking outside help, including preventing cooperation in a criminal investigation or prosecution); *Garcia v. State*, No. 03–11–00403–CR, 2012 WL 3795447, at *11 (Tex. App.—Austin Aug. 29, 2012, pet. ref'd) (mem. op., not designated for publication)

–23–

(prior domestic abuse and other acts showing victim's isolation supports forfeiture by wrongdoing finding).  We cannot conclude, based on this record, that the trial court abused its discretion in finding a forfeiture by wrongdoing and admitting Sandoval's out-of-court statements.  We overrule appellant's second issue.

### 3. Sufficiency of the Evidence

In his third issue, appellant alleges the evidence is insufficient to support a finding of guilt by a rational trier of fact.

In reviewing the sufficiency of the evidence, we view all the evidence in the light most favorable to the verdict, and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson v. Virginia*, 443 U.S. 307, 313 (1979); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010).  We assume the fact-finder resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict.  *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).  We defer to the trier of fact's determinations of witness credibility and the weight to be given to their testimony.  *Brooks*, 323 S.W.3d at 899.

A person commits an assault if he intentionally, knowingly, or recklessly causes bodily injury to another.  TEX. PENAL CODE ANN. § 22.01(a)(1).  The offense is elevated to a third-degree felony if it is committed against a person who was a member of the defendant's household or family or one with whom the defendant had a dating relationship, as described in Chapter 71 of the family code, and the defendant has been convicted previously of an assault involving family violence.  *Id*. § 22.01(b)(2)(A); *see* TEX. FAM. CODE ANN. §§ 71.0021(b).

"Bodily injury" is any physical pain, illness, or impairment of the physical condition.  TEX. PENAL CODE ANN. § 1.07(a)(8).  "The existence of a cut, bruise, or scrape on the body is sufficient evidence of physical pain necessary to establish 'bodily injury' within the meaning of the statute."

*Arzaga v. State*, 86 S.W.3d 767, 778 (Tex. App.—El Paso 2002, no pet.); *Isaac v. State*, No. 05–10–00492–CV, 2011 WL 5386371, at *3 (Tex. App.—Dallas Nov. 9, 2011, no pet.) (mem. op., not designated for publication). Direct evidence of physical pain, however minor, is sufficient to establish bodily injury. *Garcia v. State*, 367 S.W.3d 683, 688 (Tex. Crim. App. 2012); *Morris v. State*, No. 05–17–00063–CR, 2018 WL 1516834, at *2 (Tex. App.—Dallas Mar. 28, 2018, no pet.) (mem op., not designated for publication). Moreover, "a fact finder may infer that a victim actually felt or suffered physical pain because people of common intelligence understand pain and some of the natural causes of it." *Morris*, 2018 WL 1516834, at *2 (citing *Garcia*, 367 S.W.3d at 688).

Appellant's argument regarding the sufficiency of the evidence is that the evidence is insufficient to show (1) an assault occurred in Collin County and (2) that Sandoval suffered bodily injury. Beginning with venue, we note that the State must prove venue in a criminal case by a preponderance of the evidence. TEX. CODE CRIM. PROC. ANN. art. 13.17; *Murphy v. State*, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003); *Rojas-Gallo v. State*, Nos. 05–17–00145–CR, 05–17–00146–CR, 2018 WL 2147924, at *5 (Tex. App.—Dallas May 10, 2018, no pet.) (mem. op., not designated for publication). The general rule provides that "[i]f venue is not specifically stated, the proper county for the prosecution of offenses is that in which the offense was committed." TEX. CODE CRIM. PROC. ANN. art. 13.18. Venue must be proven at trial to establish a defendant's legal status but it is not an element of the offense and, therefore, need not be proven beyond a reasonable doubt. *Schmutz v. State*, 440 S.W.3d 29, 34–35 (Tex. Crim. App. 2014).

Appellate courts "presume that venue was proved in the trial court unless it was disputed in the trial court or the record affirmatively shows the contrary." *Meraz v. State*, 415 S.W.3d 502, 506 (Tex. App.—San Antonio 2013, pet. ref'd) Proof of venue may be established by either direct or circumstantial evidence and the jury may "make reasonable inferences from the evidence to decide the issue of venue." *Edwards v. State*, 97 S.W.3d 279, 291 (Tex. App.—Houston [14th

Dist] 2003, pet. ref'd). Evidence is sufficient to establish venue if "from the evidence the jury may reasonably conclude that the offense was committed in the county alleged." *Rippee v. State*, 384 S.W.2d 717, 718 (Tex. Crim. App. 1964). In determining the sufficiency of the evidence, we view "all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found" by a preponderance of the evidence that the offense occurred in the county alleged. *Vanschoyck v. State*, 189 S.W.3d 333, 336 (Tex. App.—Texarkana 2006, pet. ref'd).

Appellant's argument in this case is that the evidence is insufficient to show the assault occurred in Collin County. According to the record, however, Sandoval's written statement from the night of the offense indicated that after she and appellant went into their hotel room, appellant struck her "once again in face," threw her to the floor, kicked the left side of her body, and pushed her into the bathroom to clean herself up—before anyone else showed up. In addition, she told Detective Lawrence four days later that appellant hit her in both Dallas and in Plano. Garcia testified that he saw appellant strike Sandoval in the face. Appellant argues that the State "pushed" Garcia's noncommittal statement, but Garcia testified that he saw appellant strike Sandoval even when questioned further on cross-examination. Additionally, there was evidence in the hotel room—bloody saliva in the sink and bloodstains on the bed—of recent injury from which the jury could have reasonably inferred that an offense occurred in Collin County. Appellant offered alternative explanations for why blood was found on the bed and in the sink, but the jury was free, in its role as the trier of fact and the sole judge of the weight and credibility of the evidence, to reject this self-serving testimony.

As for bodily injury, there is ample evidence that Sandoval suffered bodily injury. She had red marks on the left side of her back, and in her statement from the night of the offense she similarly indicated that appellant kicked her on the left side of her body. She also said that this

occurred inside of the hotel room. This evidence alone is sufficient for the jury to have concluded Sandoval suffered bodily injury. *See Arzaga*, 86 S.W.3d at 778. Additionally, the jury could have reasonably concluded that Sandoval suffered further bruising or abrasions on her face when appellant struck her in the face inside of the hotel room. Also, the jury was free to conclude Sandoval suffered pain when she was struck in the face. *See Morris*, 2018 WL 1516834, at *2. We conclude there is sufficient evidence for the jury to have convicted appellant of assault as charged in the indictment. We overrule appellant's third issue.

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

Do Not Publish
TEX. R. APP. 47.2(b)
170547F.U05



# Court of Appeals
# Fifth District of Texas at Dallas
## JUDGMENT

JHOVANNY ESPINOZA, Appellant

No. 05-17-00547-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 296th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 296-80265-2017.
Opinion delivered by Justice Myers.
Justices Evans and Brown participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 21st day of December, 2018.